# EXHIBIT

*amicus curiae brief  in*

*support of plaintiff*

# EXHIBIT

*amicus curiae brief  in*

*support of plaintiff*

ROBERT FERGUSON
Attorney General of Washington
KELLY T. WOOD, WSBA #40067 (pro hac vice pending)
Assistant Attorney General
 800 Fifth Avenue, Suite 2000
 Seattle, WA 98104
 Telephone: (206) 326-5494
 Fax: (206) 587-5088

KENDALL BRILL & KELLY LLP
Laura W. Brill (195889)
 lbrill@kbkfirm.com
Kendall Brill & Kelly LLP
10100 Santa Monica Blvd., Suite 1725
Los Angeles, CA 90067
Telephone: 310.556.2700
Facsimile: 310.556.2705

*Attorneys for the State of Washington*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| OCEANA, INC.,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>WILBUR ROSS, in his official capacity as Secretary of the U.S. Department of Commerce; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; and NATIONAL MARINE FISHERIES SERVICE,<br><br>　　　　　Defendants. | NO.  2:17-cv-05146 RGK-JEMx<br><br>AMICUS CURIAE BRIEF OF THE STATE OF WASHINGTON |

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

6

603135754.1

## **<u>TABLE OF CONTENTS</u>**

**Page**

I.  INTRODUCTION ..................................................................................1

II.  IDENTITY AND INTEREST OF *AMICUS CURIAE* ...........................2

III.  BACKGROUND ...................................................................................3

A.  Regulatory Framework .........................................................3

B.  The California Drift Gillnet Fishery .....................................4

C.  The Pacific Council's Process for Developing the Proposed Rule .......................................................................................9

IV.  ARGUMENT .......................................................................................12

A.  The Magnuson-Stevens Act Limits NMFS's Role in Crafting Regional Management Plans and Places Conservation Interests Over Short-Term Economic Impacts ................................12

1.  The 1996 amendments purposefully limited NMFS's role in approving fishery management plans and implementing regulations ..........................................13

2.  The 1996 amendments forbid NMFS from doing precisely what it did here, i.e., placing short-term economic interests over conservation ...................17

V.  CONCLUSION ...................................................................................19

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

7

603135754.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Conti v. U.S.*,
    291 F.3d 1334 (Fed. Cir. 2002)..........................................................................4

*Humane Soc'y of U.S. v. Clinton*,
    236 F.3d 1320 (Fed. Cir. 2001)......................................................................4, 5

*Lovgren v. Locke*,
    701 F.3d 5 (1st Cir. 2012) ................................................................................16

*Miccosukee Tribe of Indians of Florida v. U.S. Army Corps of Engineers*,
    619 F.3d 1289 (11th Cir. 2010)........................................................................14

*Nat. Res. Def. Council, Inc. v. Nat'l Marine Fisheries Serv.*,
    421 F.3d 872 (9th Cir. 2005)......................................................................15, 16

*Turtle Island Restoration Network v. U.S. Dep't of Commerce*,
    672 F.3d 1160 (9th Cir. 2012)............................................................................3

**Statutes**

5 U.S.C. § 706 ..................................................................................................16

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

8

603135754.1

16 U.S.C.

§ 1361(6) ..............................................................................................3
§ 1361 *et seq.* ......................................................................................3
§ 1362(12) ............................................................................................3
§ 1362(13) ............................................................................................3
§ 1531(c) ..............................................................................................3
§ 1531 *et seq.* ......................................................................................3
§ 1532(15) ............................................................................................3
§ 1532(19) ............................................................................................4
§ 1533 ..................................................................................................3
§ 1801(b) ..............................................................................................3
§ 1801(b)(5) ..........................................................................................3
§ 1802(39) ............................................................................................3
§ 1826(b)(1) ..........................................................................................5
§ 1826(b)(5) ..........................................................................................5
§ 1851 ..................................................................................................4
§ 1851(a) ..............................................................................................4
§ 1851(a)(9) ........................................................................................18
§ 1851(b) ..............................................................................................3
§ 1851(b)(5) ..........................................................................................4
§ 1852 ..................................................................................................4
§ 1853 ..................................................................................................4
§ 1853(a)(1) ........................................................................................18
§ 1853(a)(11) ......................................................................................18
§ 1854 ................................................................................................13
§ 1854(a)(3) ........................................................................................15
§ 1854(b) ............................................................................................15
§ 1854(b)(1) ........................................................................................14
§ 1854(b)(1)(A) ..................................................................................14
§ 1854(b)(1)(B) ..................................................................................14
§ 1854(b)(3) ........................................................................................18
§ 1854(c) ............................................................................................14
§ 1854(b)(3) ........................................................................................16

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

9

**Regulations**

50 C.F.R.
§ 600.345(b)(1) ................................................................17
§ 600.350 .........................................................................4
§ 635.71(a)(17) ................................................................6
§ 660.713 .........................................................................6
§ 660.713(b) .....................................................................7
§ 660.713(c) ......................................................................7
§ 660.713(d)(8) .................................................................6

63 Fed. Reg. 24,212, 24,224 (May 1, 1998) (codified at 50 C.F.R. pt.
600) ...................................................................................4

64 Fed. Reg. 4055 (Jan. 27, 1999) (codified at 50 C.F.R. pt. 630) ........................6

Wash. Admin. Code 220-355-080(2) (2017) .........................................6

**Other Authorities**

142 Cong. Rec. S10794-02 ....................................................14

1995 WL 227474 .................................................................14

1996 WL 528720 .................................................................14

H.R. Rep. 104-171 (1995) .....................................................15

Robin Kundis Craig & Catherine Danley, *Federal Fisheries
Management: A Quantitative Assessment of Federal Fisheries
Litigation Since 1976*, 32 J. Land Use & Envtl. L. 381, 386-87
(2017) ...............................................................................12

S. Rep. 104-276 (1996) ...........................................13, 15, 17, 18

Standards of Judgment: Intent of the Legislature, 2A Sutherland
Statutory Construction § 45:5 .................................................15

Washington Dep't of Fish & Wildlife, Species of Concern in
Washington State, *available at*
https://wdfw.wa.gov/conservation/endangered/All/ ..........................8

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

10

603135754.1

# I.    INTRODUCTION

The Magnuson-Stevens Act, as amended by the Sustainable Fisheries Act of 1996, seeks to establish sustainable fishing practices that protect the long-term viability of fisheries and limit exploitation of marine resources for short-term economic gain. The Act does so, in part, by creating a unique federal/regional regulatory partnership that places authority in the hands of eight regional fishery management councils to formulate fishery management plans for their respective jurisdictions and develop necessary or appropriate regulations to implement those plans. The Secretary of Commerce's role in this management regime, which the Secretary delegated to the National Marine Fisheries Service (NMFS), is limited to making an affirmative or negative determination that the plans and regulations are consistent with applicable law. In fact, the Secretary can only adopt his or her own fishery management plan where a regional council refuses to act.

In 2012, the Pacific Fishery Management Council (Pacific Council) began a multi-year effort to address incidental catch ("bycatch") of endangered and threatened marine species by the California Drift Gillnet fishery. After extensive public process and policy deliberations, the Pacific Council proposed a regulation establishing hard caps on bycatch of these protected species, with the fishery temporarily shutting down once the caps were exceeded. After review, NMFS made an affirmative finding of consistency and published the proposed rule in the Federal Register on October 13, 2016. Following public comment, however, NMFS reversed its affirmative determination, claiming new concerns over short-term economic impacts from the hard cap requirement. NMFS then refused to publish the final regulation.

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

11

603135754.1

*Amicus curiae* the State of Washington agrees with the Plaintiff that NMFS's actions in this case violate the plain language of the Magnuson-Stevens Act and its strict procedures for NMFS's review and approval of council-proposed fishery regulations. By rejecting the proposed rule, NMFS upset the role that the Act assigns to states like Washington in the development of regulations through the regional fishery management councils. As a result, the Court need not look beyond this plain language to resolve this case in Plaintiff's favor. If the Court does find the statute ambiguous, however, the legislative history of the Act (set out below) also firmly establishes that NMFS's actions should be invalidated.

## II.   IDENTITY AND INTEREST OF *AMICUS CURIAE*

Washington's interest in the current case is significant. Congress gave certain states a direct role on regional fishery management councils to help shape federal fishery rules. Because Washington's fisheries are within the jurisdiction of the Pacific Council, Washington, through its designated regulatory agency the Washington Department of Fish and Wildlife, is a permanent voting member of the Pacific Council. In this capacity, Washington participated directly in crafting the proposed fishery regulations that are at issue in this case. Washington, thus, has a vested interest in ensuring that NMFS properly adheres to the Magnuson-Stevens Act's procedures for review of regional councils' fishery management plans and implementing regulations—both as related to the proposed hard cap regulations and as precedence for other regulations that may be proposed by the Pacific Council in the future.

Washington also has a significant interest in benefits provided to the species targeted for protection by the proposed hard cap rule. Many of the species vulnerable to bycatch under the California drift gillnet fishery are migratory in nature and frequent Washington waters, including humpback and sperm whales,

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

12

603135754.1

sea turtles (leatherback, loggerhead, and green turtles), and a host of other marine animals. Because many of these species are listed as endangered or threatened under Washington State law, Washington expends significant resources on protecting these species and their habitat. These efforts are undermined by bycatch in the California drift gillnet fishery, particularly when Washington has for decades prohibited the use of drift gillnets in state coastal waters because of the adverse impacts. As NMFS has acknowledged, the hard cap rule—if implemented—will likely decrease bycatch rates. As a result, NMFS's reversal of its affirmative decision on the proposed rules means that neither the anticipated reduction of bycatch of protected species, nor Washington's burden of protecting these species, will be lessened.

## III.   BACKGROUND

### A.   Regulatory Framework

The California drift gillnet fishery is subject to several other statutes in addition to the Magnuson-Stevens Act, including the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, and the Marine Mammal Protection Act, 16 U.S.C. § 1361 *et seq.*[1] The Magnuson-Stevens Act, however, remains the primary regime for managing fisheries in United States waters. *Compare* 16 U.S.C. § 1361(6) (stating "the goal to obtain an optimum sustainable population" of marine mammals); *with* 16 U.S.C. § 1531(c) (stating policy "to conserve endangered species and threatened species"); 16 U.S.C. § 1801(b) (act designed to "conserve and manage the fishery resources found off the coasts of the United States").[2]

---

[1] The National Marine Fisheries Service, an office of the National Oceanic and Atmospheric Administration within the Department of Commerce, implements each statute. *See* 16 U.S.C. §§ 1362(12); 1532(15); 1533; 1802(39); 1851(b).

[2] Under the Marine Mammal Protection Act, "take" means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture or kill any marine mammal." 16 U.S.C. § 1362(13).

3

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

13

603135754.1

1   As described above, the Magnuson-Stevens Act created regional fishery

2   management councils "to exercise sound judgment in the stewardship of fishery

3   resources through the preparation, monitoring, and revision" of fishery

4   management plans and proposed regulations to implement such plans. 16 U.S.C.

5   §§ 1801(b)(5); 1852, 1853; *Turtle Island Restoration Network v. U.S. Dep't of*

6   *Commerce*, 672 F.3d 1160, 1166 (9th Cir. 2012). Under the Magnuson-Stevens

7   Act, any fishery management plan or regulation implementing such a plan, must

8   be consistent with the ten national standards set forth in 16 U.S.C. § 1851(a).

9   Significant to this case, National Standard 9 requires that "[c]onservation and

10  management measures shall, to the extent practicable, (A) minimize bycatch and

11  (B) to the extent bycatch cannot be avoided, minimize the mortality of such

12  bycatch." 16 U.S.C. § 1851; 50 C.F.R. § 600.350. As NMFS has previously

13  observed, this requirement to minimize bycatch or to minimize the mortality of

14  bycatch "is clearly not discretionary." Magnuson-Stevens Act Provisions; National

15  Standard Guidelines, 63 Fed. Reg. 24,212, 24,224 (May 1, 1998) (codified at 50

16  C.F.R. pt. 600).

17  **B.    The California Drift Gillnet Fishery**

18  
19      The California drift gillnet fishery targets swordfish and to a lesser extent

20  thresher sharks. To catch these target species, fishing boats deploy specially

21  designed nets that form a vertical wall in the ocean and entangle swordfish and

22  thresher sharks as they swim into the net. *See* AR 134 (figure 2); *Conti v. U.S.*, 291

23  F.3d 1334, 1336 (Fed. Cir. 2002).

24  
25  Under the ESA, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Although these definitions differ slightly, "generally, any interaction between a protected species and fishing

26  gear is considered a take" Under both statutes. AR 5848.

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

14

603135754.1

1    Drift gillnets, however, cannot distinguish between the species targeted by

2    the fishery and other non-target species that become entangled in the net. *See*

3    *Humane Soc'y of U.S. v. Clinton*, 236 F.3d 1320, 1322 (Fed. Cir. 2001); *cf. Conti*,

4    291 F.3d at 1336–37 (discussing national and international concern over drift

5    gillnets ensnaring significant numbers of sea turtles and marine mammals).

6    Although some of the non-target species may be retained and sold or kept, most

7    bycatch is discarded. *See* AR 6842; AR 5856 (estimating annual bycatch of

8    finfish). The Federal Circuit has described the drift gillnet fishery and the

9    inevitable bycatch that occurs as a result of the indiscriminate fishing method:

10           Though intended to catch fish, the nets indiscriminately

11           catch virtually all aquatic life including fish, whales,

12           dolphins, sea turtles, and sea birds. The fish are

13           captured when the mesh catches behind their gills, and

14           the whales, dolphins, and other air-breathing sea life are

15           caught when they become entangled in the net. At

16           dawn, fishermen collect the driftnets, remove the target

17           fish, and discard any non-target species, often drowned,

18           that were caught in the nets.

19    Humane *Soc'y of U.S.*, 236 F.3d at 1322.

20           Concerns over growing use of drift gillnets on international waters led the

21    United Nations to adopt a moratorium on the use of large-scale driftnets beyond

22    the exclusive economic zone of any nation. *See* 16 U.S.C. § 1826(b)(5); *Humane*

23    *Soc'y of U.S.*, 236 F.3d at 1322. In implementing the moratorium, Congress found

24    that "the continued widespread use of large-scale driftnets beyond the exclusive

25    economic zone of any nation is a destructive fishing practice that poses a threat to

26    living marine resources of the world's oceans …." 16 U.S.C. § 1826(b)(1).

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

603135754.1

1    Many areas within the exclusive economic zone have also been closed to

2    drift gillnet fishing in response to concerns about its impacts. The use of driftnet

3    gear is prohibited in the Atlantic tuna and swordfish fisheries and off the

4    Washington Coast. *See* 50 C.F.R. § 635.71(a)(17); Atlantic Swordfish Fishery;

5    Mgmt. of Driftnet Gear, 64 Fed. Reg. 4055 (Jan. 27, 1999) (codified at 50 C.F.R.

6    pt. 630); *see also* 50 C.F.R. § 660.713(d)(8); Wash. Admin. Code 220-355-080(2);

7    AR 25–26. In addition, Oregon closed its drift gillnet fishery program due to

8    inactivity in the Oregon fishery from 2006 to 2008. AR 38–39. Some California

9    leaders have also expressed a desire to transition away from the use of drift gillnets

10   in the West Coast swordfish fishery. *See* AR 2934–35 (Letter from Senators

11   Feinstein, Boxer, and Wyden advocating for transition from drift gillnets to more

12   environmentally sustainable fishing gears and the use of enforceable limits to

13   reduce bycatch); AR 2932–33 (supplemental letter from Senators reiterating

14   support for transitioning the fishery); AR 4447–48 (letter from Congressman

15   Huffman encouraging the Pacific Council to develop a comprehensive transition

16   plan and minimize bycatch); AR 5268–69 (letter from five California Assembly

17   Members advocating for a transition away from drift gillnets); AR 7237

18   (discussing legislation proposed in California House to prohibit use of drift gillnets

19   to take sharks and swordfish for commercial purposes in State waters; the bill did

20   not pass).

21   Although the California drift gillnet fishery remains open, it is subject to

22   strict time and location restrictions in an effort to limit bycatch impacts from the

23   fishery. *See e.g.*, 50 C.F.R. § 660.713; AR 22 (Final Environmental Assessment)

24   (all drift gillnets must be fished at a minimum depth of 10.9 meters below the

25   surface); AR 23–25 (describing Pacific Sea Turtle Conservation areas and other

26   federal closures); AR 26 (describing state restrictions on drift gillnet fishery); AR

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

16

603135754.1

1176 (Proposed Rule) (describing seasonal closures to drift gillnet fishery). To protect endangered leatherback and loggerhead sea turtles, a large area off the California coast extending north to Cape Falcon, Oregon is seasonally closed to the fishery, and these restrictions are extended during El Niño events. 50 C.F.R. § 660.713(c); AR 1175 (Proposed Rule). Driftnet gear also must meet certain criteria, including length limitations on the nets, 50 C.F.R. § 660.713(b), and the use of acoustic deterrent devices to try to minimize bycatch, AR 22. In addition, NMFS places observers on drift gillnet fishery vessels to monitor bycatch, but, due to funding constraints, observers monitor only about 30 percent or less of the drift gillnet fleet. AR 1175 (Proposed Rule); AR 7267 (describing role of observers in monitoring and accountability of fishery).

California Department of Fish and Wildlife also limits the number of permits issued to the California drift gillnet fishery. AR 1176 (Proposed Rule). Under California's permitting regime, California will not issue any new permits and current permits may only be transferred to another individual currently holding or eligible for a general gillnet/trammel net permit under California law. AR 26. Although currently 73 individuals hold valid permits to engage in the fishery, only about 20 vessels participate in the fishery each season. AR 1176–77 (Proposed Rule); AR 18894–95 (NOAA Technical Memorandum). These numbers represent a significant decline from the peak of the California drift gillnet fishery in the mid-1980s when the number of permits in the fishery reached 251 permits with 200 vessels participating in the fishery. AR 357 (Final Regulatory Impact Review); AR 18895 (NOAA Technical Memorandum). As shown below, the revenue from the fishery also has declined steadily, reaching an all-time low of $454,000 in 2015.

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

17

603135754.1

AR 358 (Final Regulatory Impact Review).



Although past regulatory efforts decreased bycatch rates in the California drift gillnet fishery, AR 6845, bycatch remains a reality, *see* AR 6838 (Report on Routine Management Measures to Establish Hard Caps); Mem. of Points and Auths. In Supp. of Fed. Defs.' Cross-Mot. for Summ. J. & in Opp. To Pl.'s Mot. for Summ. J. 9, ECF No. 67-1. Between 2001 and 2015, bycatch from the fishery included approximately six humpback whales, nine sperm whales, more than 12 leatherback turtles, 20 loggerhead sea turtles, 14 short-fin pilot whales, and more than 6 bottlenose dolphins. *See* ECF No. 67-1 at 9. Most of these species are protected as endangered or threatened under the Endangered Species Act and Washington law and the whale and dolphin species are further protected under the Marine Mammal Protection Act. AR 56–57, 65–67 (Final EA).[3] Although NMFS previously concluded that this bycatch level does not jeopardize listed species or significantly impact listed marine mammals, AR 6510, strong public opposition

_____

[3] *See* Washington Dep't of Fish & Wildlife, Species of Concern in Washington State, *available at* https://wdfw.wa.gov/conservation/endangered/All/.

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

18

603135754.1

exists to the California drift gillnet fishery and the associated bycatch, including the number of other, non-protected species that the fishery discards as bycatch. *See e.g.,* AR 6864–7160, 7165–7236. The Pacific Council estimates that each year the California drift gillnet fishery catches and discards an average of nearly 12,000 finfish, including sharks, tuna, marlin, mackerel, and common mola. AR 5856. Close to 3,000 of those species are discarded dead. *Id.*

## C.    The Pacific Council's Process for Developing the Proposed Rule

In October 2016, NMFS published the proposed regulation to implement an immediate closure of the drift gillnet fishery when observed mortality or injury to high priority species—including fin, humpback, and sperm whales, leatherback, loggerhead, olive ridley, and green sea turtles, short-fin pilot whales, and bottlenose dolphins—meets or exceeds the established hard cap for any of these species during a rolling 2-year timeframe. AR 1176 (Proposed Rule). The Pacific Council issued the proposed rule implementing hard caps after several years of consideration. *See* AR 1175 (Proposed Rule); AR 13008–09 (March 2012 Decision Summary Document). During this time, the Pacific Council engaged in several wide-ranging discussions on the status and future prospects for the California drift gillnet fishery, including the prospect of transitioning the fishery to full federal management under Magnuson-Stevens Act authority and ultimately eliminating drift gillnet gear in favor of "more environmentally and economically sustainable gear types." AR 7237–38; AR 7426–27. In response to these discussions, the Pacific Council received thousands of public comments and signatures, including from business owners, chefs, and game fisherman, encouraging the Pacific Council to phase out the drift gillnet fishery and transition to a more sustainable fishery. *See, e.g.,* AR 4620–5013, 5927–6256, 6864–7160, 7165–7236. NMFS received

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

19

603135754.1

1  only limited comments in favor of retaining the drift gillnet fishery. *See e.g,* AR
2  6853–63.

3       As part of its consideration of the future of the California drift gillnet fishery,
4  and more broadly the West Coast swordfish fishery, the Pacific Council
5  enumerated several policy objectives for managing the West Coast swordfish
6  fishery, including using hard caps to reduce bycatch of high priority species,
7  increasing observer coverage on vessels to help facilitate implementation of hard
8  caps and other bycatch reduction efforts, and supporting collaboration between
9  stakeholders to "develop alternative fishing gears, conduct research to further
10  minimize bycatch in the DGN fishery, maintain a viable domestic West Coast
11  highly migratory species fishery, and reduce capacity in the DGN fishery through
12  buyouts and other incentives." AR 7266–67 (June 2014 Decision Summary
13  Document). The Pacific Council's policy objectives also included routinely
14  reviewing the performance of the DGN fishery "to evaluate its ability to operate
15  within hard cap levels and successfully minimize bycatch of other discard species
16  according to bycatch performance standards to be adopted by the Council." AR
17  7267. Although the Pacific Council "discussed a policy goal to end the DGN
18  fishery and transition to a swordfish target fishery that excludes DGN gear at some
19  point in the future," the Pacific Council instead decided to pursue a policy of
20  "strong management measures designed to improve the target performance of the
21  DGN fishery, while at the same time encouraging alternative gears that can provide
22  for a viable commercial fishery with significantly better bycatch performance than
23  the past DGN fishery." AR 6338 (November 2014 Decision Summary Document).
24  The hard caps were a key part of implementing this policy. *See* AR 5842 (Proposed
25  Management and Monitoring Plan); AR 6338–39.

26       The Pacific Council engaged in a detailed process to implement its policy

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

20

603135754.1

1    objectives culminating in transmitting the proposed hard cap rule to NMFS in

2    September 2016. *See* AR 1326–27 (letter transmitting proposed regulations to

3    implement hard caps). During this process, the Pacific Council considered different

4    alternatives to implement its hard caps, observer monitoring and bycatch

5    performance objectives, AR 5842 (report on proposed management and

6    monitoring plan); AR 5068–69 (June 2015 Decision Summary Document), created

7    a proposed California Drift Gillnet Management and Monitoring Plan, AR 5842–

8    64, and developed a regulatory impact review, AR 1589–1602. Notably, in

9    proposing the hard caps, the Pacific Council sought "to protect certain non-target

10    species and increase incentives to reduce bycatch." AR 1326. Although the Pacific

11    Council could have sought to reduce bycatch by proposing to close the drift gillnet

12    fishery, the Pacific Council instead proposed hard caps as an incentive for the

13    fishery to voluntarily change their fishing practices to avoid or reduce bycatch. The

14    Pacific Council did not intend "to manage marine mammal or endangered species

15    populations, but rather to enhance the provisions of the Endangered Species Act

16    and the Marine Mammal Protection Act through implementation of MSA section

17    303(b)(12) and National Standard 9." *Id.*

18         In its Draft Environmental Assessment, NMFS agreed with the Pacific

19    Council that the hard caps would result in a beneficial effect to hard cap species.

20    AR 1290. Although unable to definitively quantify, NMFS also acknowledged that

21    potential benefits to protected species could flow from incentives the hard cap rule

22    would place on vessel operators to reduce future bycatch of hard cap species to

23    avoid fishery closures. *See* AR 1177.

24

25

26

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

21

# IV.   ARGUMENT

**A.   The Magnuson-Stevens Act Limits NMFS's Role in Crafting Regional Management Plans and Places Conservation Interests Over Short-Term Economic Impacts**

What is now commonly known as the "Magnuson-Stevens Act" originated as the Magnuson Fishery Conservation and Management Act of 1976. In its original form, the Act sought to both gain control over U.S. coastal fisheries by establishing an exclusive economic zone off coastal waters, and respond to a general lack of regulatory oversight that was leading to overfishing. Robin Kundis Craig & Catherine Danley, *Federal Fisheries Management: A Quantitative Assessment of Federal Fisheries Litigation Since 1976*, 32 J. Land Use & Envtl. L. 381, 386-87 (2017). After 20 years of fisheries management under the Magnuson Act, however, serious cracks were showing.

First, the "conservation" aspect of the original Magnuson Act proved ineffective. Despite shutting out foreign fishing within the exclusive economic zone, fish stocks and marine species continued to decline precipitously. By the 1990s, certain stocks were threatening to collapse completely. Second, in addition to continued overfishing, the Magnuson Act's process for establishing effective, de-centralized management policies became bogged down by inefficiencies. The Magnuson Act placed primary responsibility for fishery management with eight regional fishery councils in order to place local knowledge at the heart of fishery policy. However, the Secretary of Commerce (again, delegated to NMFS) was given responsibility over reviewing and adopting regional fishery management plans and implementing regulations. As originally drafted this process was cumbersome, and timelines for approving these plans and regulations often stretched out for months, leaving fisheries in limbo.

Congress responded to these and other problems via the Sustainable

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

22

Fisheries Act of 1996, Pub. L. No. 104-297, 110 Stat. 3559 (1996). As set out below, this massive overhaul of the Magnuson Act, now dubbed the Magnuson-Stevens Act, sheds light on the problems Congress sought to address in the amendments and explains why Defendants' actions in this case violate both the letter and the intent of the 1996 amendments.

### 1. The 1996 amendments purposefully limited NMFS's role in approving fishery management plans and implementing regulations

Defendants' interpretation of the procedures and process for approving or disapproving proposed fishery management plan regulations cannot be reconciled with either the plain language of the Magnuson-Stevens Act or its legislative history and should be rejected.

The statutory provisions central to this case (codified at 16 U.S.C. § 1854) were grafted onto the Magnuson Act by the Sustainable Fisheries Act in 1996 as part of Congress' efforts to "streamline the approval process for fishery management plans and regulations[.]" S. REP. No. 104-276, at 1 (1996). Streamlining was certainly necessary in 1996. As is common for many regulatory efforts, regional councils often employed "framework" fishery management plans that relied on separate implementing regulations to establish key parameters such as season openings and closures, allowable catches, and harvest allocations. S. REP. NO. 104-276 at 18. The 1976 Magnuson Act, however, did not contain provisions setting sideboards on NMFS's review and approval of such regulations. As a result, many months would often lapse prior to approval, leaving regional councils and regulated vessel operators in the dark as to critical aspects of how the fishery would be regulated right up to (or beyond) its opening. *Id*. This led to "growing frustration" that the Magnuson Act's attempt to de-centralize fishery policy was mired in "redtape" and led to calls for "limiting the role of the Secretary

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

23

603135754.1

1    [i.e., NMFS] in modifying Council decisions[.]" 142 Cong. Rec. S10794-02,

2    S10820, 1996 WL 528720; 1995 WL 227474.

3           Congress heeded those calls. The Sustainable Fisheries Act reworked the

4    Magnuson Act to place *significant* limitations on NMFS's review and approval of

5    regulations crafted by regional councils.

6           First, and as with review of fishery management plans, Congress limited

7    NMFS's review of implementing regulations to only a determination of whether

8    the regulation is consistent with the fishery management plan itself, the goals and

9    policies of the Magnuson-Stevens Act, and "other applicable law." 16 U.S.C. §

10   1854(b)(1). NMFS was only allowed to develop its own regulations in the event a

11   regional council failed to discharge its duty to do so. *See* 16 U.S.C. § 1854(c).

12          Next, Congress imposed strict timeline restrictions on NMFS by providing

13   only 15 days after receipt of proposed regulations to complete review. Following

14   that review, and within those 15 days, Congress required NMFS to make one of

15   two possible actions: (1) an affirmative determination of consistency; or (2) a

16   negative determination of consistency. 16 U.S.C. § 1854(b)(1)(A)–(B). If

17   affirmative, Congress required NMFS to immediately publish the regulations in

18   the Federal Register for a public comment period not to exceed 60 days and then

19   publish a final rule within 30 days from the close of public comment. *Id*. If

20   negative, Congress did not allow NMFS to reject the regulations outright; rather,

21   Congress required NMFS to provide written recommendations to the appropriate

22   regional council on how the proposed regulations could be made consistent. *Id*.

23   These duties are mandatory, and no other options were provided. *See id*.

24          There is no dispute that Defendants did not follow this procedure in this

25   case. Rather, Defendants argue that—within this extremely circumscribed

26   framework—Congress intended an unwritten, "third" path. Specifically,

14

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

24

603135754.1

Defendants assert that 16 U.S.C. § 1854(b) tacitly allows NMFS to make a tentative or preliminary affirmative determination, later convert that determination into a negative one following public comment, and then refuse to publish final regulations. ECF No. 67-1 at 13. But Defendants' interpretation is belied by the language and structure of the statute and its legislative history and represents precisely the kind of delay and inefficiency Congress sought to tamp out in the Sustainable Fisheries Act.

In fact, in 1995 and 1996, the House of Representatives considered language that would have allowed NMFS to do what was done in this case, i.e., "decline to publish" final regulations following the public comment period based on some objection to the proposal. *See* H.R. REP. NO. 104-171, at 10 (1995). However, drafters struck this language from the final bill during the reconciliation process in favor of the much more rigid procedures proposed by the Senate and now codified in the statute.[4] *C.f.* H.R. REP. 104-171, at 10 *with* S. REP. 104-276, at 106–07 (1996). Because there is no evidence that Congress was unaware of this change in language, this Court should presume the change was purposeful and that Congress intended exactly what the statute now says: once an affirmative determination is made, NMFS must publish a final rule after public comment. *Miccosukee Tribe of Indians of Florida v. U.S. Army Corps of Engineers*, 619 F.3d 1289 at 1300 n. 18 (11th Cir. 2010) (recognizing that changes between subsequent drafts of a statute provide evidence of legislative intent); *see also* Standards of Judgment: Intent of the Legislature, 2A Sutherland Statutory Construction § 45:5 (7th ed.) (recognizing

---

[4] The process Congress ultimately adopted is even more rigorous when it comes to the approval of fishery management plans. The Sustainable Fisheries Act's amendments prohibits NMFS from responding to public comments through revisions to a regional council's proposed fishery management plan. *See* 16 U.S.C. § 1854(a)(3). The limits on review and approval of fishery management plans further demonstrate Congress's clear intent to streamline the fishery plan and implementing regulations approval process.

AMICUS CURIAE BRIEF OF THE STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

25

1    same).

2        Defendants also attempt to counter the plain language of the statute by

3    insisting that Congress could not have intended NMFS to fail to correct problems

4    or conduct a public process and then ignore the content of any public feedback

5    received. ECF No. 67-1 at 14. But that result does not flow from either the statutory

6    language or the position asserted by Plaintiff in this case. Indeed, Congress

7    expressly gave NMFS the ability to modify council-proposed regulations

8    following public comment, so long as NMFS consults with the appropriate regional

9    council prior to making such changes. *See* 16 U.S.C. § 1854(b)(3). This allows

10   NMFS and the regional council to work together and be responsive to public

11   feedback while maintaining the efficiencies and strict timelines set out in the

12   statute for timely approving fishery regulations.[5] There is no dispute that this is not

13   what happened in this case and, as a result, there should be little dispute that NMFS

14   strayed beyond what the statute allows when it failed to follow these procedures.

15       In short, given the limitations of NMFS's authority relative to the Pacific

16   Council's actions, NMFS should have expressed its concerns based on the public

17   comment period to the Pacific Council and worked with the Pacific Fishery

18   Council to ensure timely finalization of the regulations, as the Magnuson-Stevens

19   Act requires. Instead, NMFS undercut the strict process laid out in the Act by

20   unilaterally reversing its original "affirmative" determination, refusing to publish

21   a final rule, and leaving the fishery in limbo. There is no basis in the law for doing

22   so, and this Court should invalidate NMFS's action.

23

24

25       [5] It also avoids the "parade of horribles" (such as being forced to adopt an
     unconstitutional regulation) trotted out by Defendants in their attempt to skirt the Act's
26   requirements. *See* ECF No. 67-1 at 14.

16

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

26

603135754.1

### 2. The 1996 amendments forbid NMFS from doing precisely what it did here, i.e., placing short-term economic interests over conservation

In addition to violating the mandatory procedures for reviewing proposed regulations, Defendants' actions in this case also violate the policies set out in the revised Act.

The Sustainable Fisheries Act did not just tackle the inefficiencies in the regional council management plan and regulation approval process discussed above. The Act constituted a wholesale re-alignment of the policy priorities of U.S. fisheries regulation. Where the 1976 Magnuson Act focused on curtailing foreign fishing within the exclusive economic zone and maximizing U.S. fisheries yields, the Sustainable Fisheries Act amendments sought to prevent overfishing by U.S. vessels and rebuild limited and threatened fishery resources. S. REP. NO. 104-276, at 1 (1996).

Key to these efforts, the Sustainable Fisheries Act reworked the Magnuson Act to recognize that individualized and short-term economic interests are antithetical to the long-term survival of U.S. fisheries. *See Nat. Res. Def. Council, Inc. v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 879 (9th Cir. 2005). As a result, Congress chose in the revised Act to "give conservation of fisheries priority over short-term economic interests." *See id*. While impacts to individual affected fishing communities are taken into account, those economic impacts are "subordinate" to the Act's "overarching conservation goals" and "must not compromise the achievement of [the Act's] conservation requirements...." *Lovgren v. Locke*, 701 F.3d 5, 35 (1st Cir. 2012), *citing* 50 C.F.R. § 600.345(b)(1).

Congress' focus on fishery conservation is now embodied throughout the Act, including the express targeting of bycatch, which Congress viewed as

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

27

603135754.1

1    particularly wasteful and harmful to all U.S. fisheries. 16 U.S.C. § 1851(a)(9); *see*

2    *also* S. REP. 104-276, at 5–6. Indeed, National Standard 9 requires that

3    "[c]onservation and management measures shall, to the extent practicable, (A)

4    minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the

5    mortality of such bycatch." 16 U.S.C. § 1851(a)(9).

6         As set out in greater detail above, the Pacific Fishery Council reasonably

7    determined in this case that hard caps were necessary, appropriate, and practicable

8    measures to minimize bycatch of non-target species and help protect the long-term

9    health and stability of the California Drift Gillnet Fishery—consistent with

10   National Standard 9. NMFS reversed that determination (purportedly under

11   National Standard 7) based solely on a "new economic analysis of short-term

12   effects on individual [drift gillnet] Fishery participants." ECF No. 67-1 at 7; AR

13   1023.

14        But this focus on short-term interests directly violates the bycatch-related

15   conservation mandates of the Act. *See* 16 U.S.C. § 1853(a)(1), (11). Thus, even if

16   NMFS had the authority to reverse its initial affirmative determination, NMFS

17   action here should still be invalidated under Section 706 of the Administrative

18   Procedures Act as contrary to law because it elevates economic concerns over

19   conservation. *See Lovgren*, 701 F.3d at 35; *see also* 5 U.S.C. § 706. Furthermore,

20   from a procedural standpoint and in light of the existing "affirmative"

21   determination, any "new economic analysis" developed by NMFS should have

22   been shared with the Council along with a request that the Council work with

23   NMFS to revise the regulation in light of the new data. *See* 16 U.S.C. § 1854(b)(3).

24   In this manner, the Council could have then reviewed the new analysis and

25   determined whether, as a matter of policy, the short-term effects on individual

26   fishery participants actually outweighed the greater risks to conservation, which is

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

603135754.1

the proper role of the Council.

NMFS's justifications—namely that the hard cap rule would permanently drive drift gillnet fishermen to "other professions"—is irrational. ECF No. 67-1 at 7. NMFS itself invalidated this argument when it acknowledged the improbability of the caps ever being reached, and further recognized the potential effectiveness of incentives to avoid risky fishing practices created by the hard caps. *See* AR 1290; AR 1177 (recognizing that hard caps would only be reached approximately every *thirteen* fishing seasons and that fishermen's deliberate efforts to avoid reaching the hard caps may further reduce the frequency of hard cap species catch in the future). Put another way, NMFS claims a need to reject the Pacific Council's hard cap rule based on impacts that NMFS itself agrees will rarely—if ever—happen because of the hard caps. *Id*. NMFS's explanations are implausible, contrary to the law, and should be rejected.

## V.   CONCLUSION

Defendants' actions in this case violate both the spirit and letter of the Magnuson-Stevens Act. NMFS violated the strict mandates Congress set out for review and approval of fishery regulations proposed by regional councils, and its focus on short-term economic impacts over conservation measures render its action contrary to law. *Amicus curiae* the State of Washington respectfully requests that this court grant Plaintiff's Motion for Summary Judgment.

//

//

//

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

19

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

29

1    DATED this 27th day of August, 2018.

2                              ROBERT W. FERGUSON
                               Attorney General of Washington
3

4                              /s/ Kelly T. Wood
                               Kelly T. Wood (*pro hac vice* pending)
5                              Assistant Attorney General
                               Washington  Attorney  General's  Office
6                              Counsel for Environmental Protection
                               800 5th Ave Ste. 2000 TB-14
7                              Seattle, Washington 98104
                               (206) 326-5493
8                              Email: kelly.wood@atg.wa.gov

9

10   DATED:  August 27, 2018   KENDALL BRILL & KELLY LLP

11

12                       By: /s/ Laura W. Brill
13                           Laura W. Brill
14                           Special Assistant Attorney General
                             Attorneys for the State of Washington
15

16

17

18

19

20

21

22

23

24

25

26

AMICUS CURIAE BRIEF OF THE
STATE OF WASHINGTON

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 5th Ave., Ste. 2000, TB-14
Seattle, WA 98104-3188
(206) 326-5494

30

603135754.1